1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO MASON DELGADO, | No. 2:14-cv-1739 GGH P |
| Petitioner, | |
| v. | ORDER |
| MARTIN BITER,[1] | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[2] Petitioner challenges a judgment of conviction entered against him on February 22, 2010 in the Yolo County Superior Court on charges of attempted murder, mayhem, second degree robbery, assault by means of force likely to produce great bodily injury, conspiracy to commit a felony, and criminal street gang activity. (CT 546.) Petitioner seeks federal habeas relief on the following grounds: (1) the conviction was based on insufficient

---

[1] "The People of the State of California" was previously named as the respondent. Martin Biter is currently the warden of Kern Valley State Prison, where petitioner is incarcerated. "A petitioner for habeas corpus relief must name the state officer having custody of him or her as the respondent to the petition." Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir.1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254). Accordingly, the court substitutes Martin Biter as respondent.
[2] This action is before the undersigned pursuant to the parties' consent to proceed before a magistrate judge. 28 U.S.C. § 636(c).

1

evidence that petitioner intended to kill the victim; (2) there was insufficient evidence to prove the crimes were for the benefit of a gang; and (3) admission of prior bad character evidence violated due process.  Upon careful consideration of the record and the applicable law, the undersigned will order that petitioner's application for habeas corpus relief be denied.

BACKGROUND

In its memorandum and opinion, which was certified for partial publication, striking the great bodily injury enhancement, correcting a typographical error in the abstract of judgment, but affirming petitioner's judgment of conviction in all other respects on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> David Eid was driving on West Capitol Avenue in West Sacramento around 3:00 a.m. on January 21, 2009, when he saw three men engaged in what he thought was horseplay. As he drove by, however, it looked like it was getting excessive because one of the men was down on the ground and the others were hitting him. Eid looked in his rearview mirror and saw the two men viciously punching and kicking the man on the ground. One man was at the victim's feet and was kicking him in the lower body and crotch. The other man was at the victim's head, "doing more of the beating on the head" and "really working on him." The men were kicking the victim and appeared to be enjoying it.
>
> Eid made a U-turn and drove back. The victim was not moving, appeared to be "out cold," and the two men were hitting and kicking him around like a "rag doll." It was "pretty brutal" and they were "giving it all they had." The attack was not constant; the men would step back, then kick and hit the victim again. Eid gunned his engine and when the men saw that Eid was going to stop his truck, they took off running. Eid did not get a good look at their faces, but one man, who was wearing a baseball cap, had a look of defiance.
>
> Eid called 9–1–1 and told the dispatcher that the victim, later identified as Jacques Harpst, was "having a hard time breathing," was "gurgling," and was "not responsive." Harpst's pockets were pulled out and Eid thought the two men "might have rolled him."
>
> Officer Jack Hatton responded to the scene. Harpst was bleeding profusely from his mouth and nose, and both of his eyes were swollen to the size of golf balls. Harpst made gurgling sounds as he tried to breathe. Hatton suspected defendant, who lived a block away, was involved. A subsequent investigation proved that his suspicions were correct, and that defendant's accomplice was Michael Romero.
>
> Harpst, age 48, did not recall the beating but remembered waking up in the hospital and being there for several months. Harpst was in the neurosurgery intensive care unit at UC Davis Medical Center.

According to his brother Michael, Harpst was not "conscious" when Michael first came to visit him in the hospital, and Harpst had tubes down his throat. Michael remembered Harpst becoming "conscious" a couple weeks after the attack, when Harpst began moving his eyes and arms and began fighting to get out of his restraints. According to Michael, the beating altered Harpst's memory, hearing, sense of smell and ability to use a computer.

Dr. David Shatz, a trauma surgeon, was one of the healthcare providers who treated Harpst. A trauma surgeon takes care of the most severely injured patients, and when certain criteria are met, paramedics take a patient directly to a trauma center rather than a standard emergency room. Dr. Shatz saw Harpst when he first arrived, and based on a review of Harpst's medical charts, Dr. Shatz testified that Harpst had facial fractures and "a depressed mental status."

Dr. Shatz described the Glasgow Coma Scale, which physicians use to grade degrees of brain impairment. The Glasgow Coma Scale takes into account three aspects: the ability to move, the ability to speak, and the ability to move one's eyes around. The worst score a person can have is one point in each of the three categories, a Glasgow Coma Scale score of 3. A person with a score of 3 is "totally comatose." According to Dr. Shatz, a dead body would have a score of 3. The best possible score, the score for a normal healthy person, is a score of 15. A drunk person would likely score a 14. A score of 8 means the brain is severely injured and the person cannot protect his or her airway from aspirating vomit.

Dr. Shatz said Harpst scored a 9 on the Glasgow Coma Scale, which reflected a severe brain injury. Because of the severe injury, doctors opted to intubate him to protect his airway. When the prosecutor asked Dr. Shatz if it was fair to say in laymen's terms that Harpst was comatose, the doctor replied, "I will stick with the scale." Harpst remained on a ventilator for a few days, and was in the intensive care unit for a month. Dr. Shatz testified that Harpst was "conscious" during the month he was in the intensive care unit, but Harpst was unable to push the nursing button for assistance.

Detective Warren Estrada interviewed defendant's girlfriend, Vanessa Ramos, and a recording of the interview was played for the jury. Ramos also testified at trial, although she was less forthcoming than in her interview with Estrada. Ramos identified Romero as the man who was with defendant when Harpst was beaten. She stated that defendant had been a member of the Red Nose Pittz, a Norteño gang, for a number of years. The Red Nose Pittz liked to jump people. In fact, defendant's brother was locked up for assaulting a light rail inspector. Ramos stated the gang will beat up whoever "talks shit to [th]em" or happens to walk by when the gang members are drunk.

On the night in question, Ramos was with defendant, Romero and Erica Raya at Raya's apartment. Defendant was wearing a cap and a white jacket, and Romero had on a dark jacket. Defendant and Romero walked to Del Taco and returned about 1:00 a.m. They all

sat around talking and then the two men left to "bum a cigarette" off someone. Defendant and Romero returned around 2:00 or 3:00 a.m. Romero was out of breath and immediately went into the

bathroom because he had blood on his hands. He also had a tooth in his fist; Romero removed the tooth and put it in his wallet.

Defendant told Ramos he asked a guy walking by for a cigarette and the guy "flipped out." Romero said he ran up to the guy because he thought the guy was going to hit defendant. Ramos asked if defendant hit the guy, and defendant said "no," but then said "yes." Defendant said Romero kept hitting the guy. According to Ramos, Romero appeared "fucking happy that he hit the guy or something." Ramos also said defendant told her he wanted a cigarette, but then wanted to see if the guy had any money. She told him it was "hella stupid" to rob people. Defendant asked Ramos to check if he had blood on his white jacket but she did not see any.

According to Raya, when defendant and Romero returned to her apartment they said they had beaten a guy who reacted badly when defendant asked for a cigarette. They all spent the night at Raya's place, and later on that morning she heard defendant say they beat up the guy and robbed him.

Detective Estrada interviewed defendant in February 2009, and a redacted recording of the interview was played for the jury. Initially, defendant denied hitting Harpst. But defendant eventually said he hit Harpst's neck or face once at the beginning of the altercation, and that Romero did most of the fighting. Defendant thought Romero probably believed Harpst was disrespecting him when Harpst "flipped out" about their request for a cigarette and then threw one at defendant. When Detective Estrada asked what defendant would do if someone disrespected him in front of his "homeboys," defendant said, "You disrespect them back." Defendant said rumors were going around about the fight, and people said the victim was dead or brain dead.

Officer Anthony Herrera also interviewed defendant. Defendant told Officer Herrera the altercation started because the victim disrespected defendant by throwing cigarettes at him. Defendant said he hit Harpst a few times, but mainly in the leg area. According to defendant, Romero stomped on Harpst's head.

Officer Herrera's main focus during the interview was on defendant's gang activity. Defendant belonged to the Red Nose Pittz and his gang friends called him Ryda because he was willing "to ride for the gang," which meant to commit crimes for them. Defendant admitted that he and other gang members would beat up and rob people; it was part of being in the gang. During one of Officer Herrera's previous contacts with defendant, he told Officer Herrera they committed crimes to show the Broderick Boys that the Red Nose Pittz were worthy of being a Norteño in the Broderick area, and because they were tired of getting beaten up by the Broderick Boys. The Broderick Boys were the predominant gang in the West Sacramento area.

Officer Michael Duggins testified as a gang expert regarding Norteños in general, and the Red Nose Pittz in particular. The Norteños' principal activities are assault with great bodily injury, murder and robbery. The Red Nose Pittz and the Broderick Boys are both Norteño subsets, and their rivals are the Sureños. The Red Nose Pittz are from Citrus Heights, while the Broderick Boys' territory is West Sacramento. According to Officer Duggins, both defendant and Romero were active members of the Red Nose Pittz.

Officer Duggins said that to get into a gang, it is not enough to associate with gang members; one has to engage in criminal activity that will benefit the gang. The use of force or fear creates respect with gang members. Gang members typically use monikers. A common one is Ryda, which means you are willing to ride along with the gang to party or commit crimes with them. Officer Duggins reviewed various photographs of defendant, Romero and other gang members throwing gang signs and wearing gang colors, and explained how they indicated their gang involvement. Officer Duggins had prior contacts with defendant in which defendant admitted he was a gang member.

Officer Duggins opined that the beating and robbery of Harpst was committed in furtherance of the gang because (1) the gang member and gang gained a material benefit from whatever was taken from the victim, and (2) the gang member and gang achieved an increase in status. According to Officer Duggins, the crime increased defendant's status in the gang, and elevated the gang's status in the community via word of mouth. Officer Duggins testified that when he and fellow law enforcement officers were investigating the assault, many people had heard about the crime. Defendant and Romero were well-known gang members and these offenses elevated the gang's status. Ramos, defendant's girlfriend, told Officer Duggins that defendant had participated with other gang members in assaulting and robbing people to gain the gang's respect, and that they would brag about their escapades "to show that they had put in work for the gang."

(Res't's Lod. Doc. 1 at 3-8; 213 Cal.App.4th 660, 662-66, 153 Cal. Rptr.3d 260 (2013).)

After petitioner's judgment of conviction was affirmed except as outlined above by the California Court of Appeal, he filed a petition for review in the California Supreme Court. (Resp't's Lod. Doc. 5.)  The Supreme Court denied the petition without comment or citation on May 2, 2013.  (Resp't's Lod. Doc. 6.)  On July 23, 2014, petitioner filed the instant federal habeas petition in this court.

DISCUSSION

I. AEDPA Standards

The statutory limitations of federal courts' power to issue habeas corpus relief for persons

in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

2254(d) does not require a state court to give reasons before its decision can be deemed to have

been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

Rather, "when a federal claim has been presented to a state court and the state court has denied

relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris

v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when

it is unclear whether a decision appearing to rest on federal grounds was decided on another

basis).  "The presumption may be overcome when there is reason to think some other explanation

for the state court's decision is more likely."  Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state

court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an *unreasonable*

application of federal law is different from an *incorrect* application of federal law.'"  Harrington,

supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as

'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786,

citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or …

could have supported[] the state court's decision; and then it must ask whether it is possible

6

1    fairminded jurists could disagree that those arguments or theories are inconsistent with the

2    holding in a prior decision of this Court." Id. "Evaluating whether a rule application was

3    unreasonable requires considering the rule's specificity.  The more general the rule, the more

4    leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the

5    stringency of this standard, which "stops short of imposing a complete bar of federal court

6    relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

7    cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

8    was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

9         The undersigned also finds that the same deference is paid to the factual determinations of

10   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

11   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

12   decision that was based on an unreasonable determination of the facts in light of the evidence

13   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

14   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

15   factual error must be so apparent that "fairminded jurists" examining the same record could not

16   abide by the state court factual determination.  A petitioner must show clearly and convincingly

17   that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.

18   969, 974 (2006).

19        The habeas corpus petitioner bears the burden of demonstrating the objectively

20   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

21   Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

22   show that the state court's ruling on the claim being presented in federal court was so lacking in

23   justification that there was an error well understood and comprehended in existing law beyond

24   any possibility for fairminded disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  "Clearly

25   established" law is law that has been "squarely addressed" by the United States Supreme Court.

26   Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008).  Thus, extrapolations of

27   settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

28   Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006) (established law not permitting state

1   sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

2   prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

3   established law when spectators' conduct is the alleged cause of bias injection).  The established

4   Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

5   controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

6   federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

7        When a state court decision on a petitioner's claims rejects some claims but does not

8   expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

9   the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___, 133 S. Ct.

10  1088, 1091 (2013).  However, if the state courts have not adjudicated the merits of the federal

11  issue, no AEDPA deference is given; the issue is reviewed *de novo* under general principles of

12  federal law.  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).

13       The state courts need not have cited to federal authority, or even have indicated awareness

14  of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S. Ct. at 365.

15  However, where the state courts have not addressed the constitutional issue in dispute in any

16  reasoned opinion, the federal court will independently review the record in adjudication of that

17  issue.  "Independent review of the record is not de novo review of the constitutional issue, but

18  rather, the only method by which we can determine whether a silent state court decision is

19  objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

20  II.  Insufficient Evidence

21       A.  Legal Standards

22       The Due Process Clause of the Fourteenth Amendment "protects the accused against

23  conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

24  crime with which he is charged."  In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L.Ed.2d

25  368 (1970).  When a challenge is brought alleging insufficient evidence, federal habeas corpus

26  relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

27  most favorable to the prosecution, no rational trier of fact could have found "the essential

28  elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. U.S. v. Nevils, 598 F.3d 1158, 1164 (9th Cir.2010) (en banc). First, the court considers the evidence at trial in the light most favorable to the prosecution. Id., citing Jackson, 443 U.S. at 319, 99 S. Ct. 2781, 61 L.Ed.2d 560. "'[W]hen faced with a record of historical facts that supports conflicting inferences," a reviewing court 'must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id., quoting Jackson, 443 U.S. at 326, 99 S. Ct. 2781, 61 L.Ed.2d 560.

"Second, after viewing the evidence in the light most favorable to the prosecution, a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id., quoting Jackson, 443 U.S. at 319, 99 S. Ct. 2781, 61 L.Ed.2d 560. "At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." Id.

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

B. Sufficient Evidence of Intent to Kill

In his first claim, petitioner contends that there was "insufficient evidence of a planned intent to kill Harpst because it was the unjoined principal who escalated his conduct resulting in the serious injuries suffered by the victim in this case." (ECF No. 1 at 5.) Petitioner claims that it was Michael Romero who was doing more of the beating around the victim's head and torso, and that petitioner was not harming Harpst in any "vital bodily areas," but was hitting him near the shin and ankles. (Id.) Respondent contends that this argument is faulty for two reasons, because the standard in McDaniel v. Brown, 558 U.S. 120, 133 (2010), is to collect all evidence in support

of judgment and view the jury's explicit and implicit findings with deference, and because the

state court found in the alternative that the evidence was sufficient to convict petitioner of

attempted murder under a natural and probable consequence or aider and abettor theory, thus

obviating the requirement of a specific intent to kill.

The California Court of Appeal rejected the argument that there was insufficient evidence

of specific intent to kill, as set forth in the following portion of the opinion:

> Defendant contends his conviction for attempted murder must be reversed because the evidence is insufficient to prove he harbored the specific intent to kill, or that he aided and abetted Romero in committing attempted murder. Defendant maintains he simply kicked Harpst in the lower half of his body, while Romero punched and kicked Harpst's head; that the nature of defendant's assault on Harpst does not support an inference that he intended to kill Harpst rather than simply hurt him; and that attempted murder is not a natural and probable consequence of any of the crimes he aided and abetted Romero in committing against Harpst. We disagree.
>
> In reviewing the evidence to determine whether it is sufficient to support the verdict, we view the entire record in the light most favorable to the judgment, and presume in support of the verdict the existence of every fact a jury reasonably could have deduced from the evidence. (*People v. Carter* (2005) 36 Cal.4th 1114, 1156.) The evidence is sufficient to support the verdict if, so viewed, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*People v. Wilson* (2006) 138 Cal.App.4th 1197, 1201.)
>
> The specific intent to kill is a requisite element of attempted murder. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) It is essentially the same as express malice, which requires a showing that the assailant either desires the victim's death or knows to a substantial certainty that the result will occur. (*Ibid.*) There is rarely direct evidence of a defendant's intent to kill; it "'must usually be derived from all the circumstances of the attempt, including the defendant's actions.'" (*Id.* at p. 741.)
>
> "'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920.)

"'[T]o be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough….'   [Citation.]' [Citation.] A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury." (*People v. Medina*, *supra*, 46 Cal.4th at p. 920.)

Here, defendant and Romero viciously attacked Harpst for nothing more than feeling disrespected because he tossed a cigarette at defendant. While Romero wailed away at Harpst's head, defendant kicked at Harpst's legs and torso, thereby ensuring Harpst could not get up and escape from the assault.[3]  According to Eid, the two men were brutally kicking the victim around like a rag doll, "giving it all they had," and they appeared to be enjoying it.   Eid believed the men "weren't horsing around because [Harpst] just wasn't moving, and they were still beating on him pretty good."   Eid turned his truck around and drove back to intervene because, in his opinion, if he had not done so "they would have killed him."   The beating inflicted by Romero and defendant was so severe that Harpst suffered a significant brain injury, multiple facial fractures, his eyes were swollen to the size of golf balls, and blood was pouring from his mouth and nose.  The nature of the attack and the severity of the injuries supports an inference that both men intended to kill Harpst.

That Romero might have delivered the worst of the blows does not absolve defendant of liability for attempted murder.  Defendant does not dispute that he knowingly and intentionally participated in the attack on Harpst, or that the evidence is sufficient to support his and Romero's convictions for mayhem, and assault by means of force likely to cause great bodily injury.  Thus, even if the evidence were not sufficient to support an inference that defendant intended to kill Harpst, the evidence demonstrates that defendant is guilty of attempted murder on an aiding and abetting theory.   He intentionally assisted Romero in a vicious assault that was carried out in such a manner that a reasonable person would have foreseen that Romero was trying to kill Harpst; that is, attempted murder was a natural and probable consequence of the assault with great bodily injury.   Rather than stopping when Romero escalated the attack against the helpless victim, defendant chose to pause, step back, and then continue kicking Harpst.  Substantial evidence supports the verdict of attempted murder.

(Res't's Lod. Doc.1 at 8-10.)

Petitioner's claim is limited to challenging the attempted murder conviction on the basis

---

[3]  The evidence indicates it was Romero who was pummeling and kicking Harpst's head because (1) Eid indicated one man was at Harpst's head doing more of the beating on the head while the other attacker was at Harpst's feet, and (2) when defendant and Romero returned to Raya's apartment, Romero had a tooth in his fist and blood on his hands while defendant did not have blood on his white jacket.

of his lack of specific intent to kill.  That conviction, however, was based also on the alternative theory of liability, aiding and abetting.  The Court of Appeal specifically found that if the evidence of intent to kill was not sufficient, it was sufficient to find that petitioner aided and abetted Romero because a reasonable person would foresee that Romero was trying to kill Harpst and therefore his assault with great bodily injury would naturally and probably result in attempted murder.  The undisputed facts are that petitioner participated in the beating, and although focusing on the victim's legs, he was well aware of Delgado's actions and that they reflected an intent to kill.  Petitioner could have stopped, and in fact paused momentarily, but then continued the kicking.  But for the bystander stopping the beating, the victim most likely would have died. A reasonable person could foresee this result, and petitioner does not dispute that he aided and abetted Romero.  As petitioner does not contest this alternative theory, it stands.

In any event, there was also sufficient evidence of intent to kill on petitioner's part. Petitioner kicked at the victim's legs and feet, ensuring he could not escape, and while the victim was in a state of total submission, lying lifeless on the ground at the time witness Eid drove by. Petitioner was beating the victim "like a rag doll" and "giving it all they had," according to the witness.  Both petitioner and Romero "appeared to be enjoying it," according to Eid.  (RT. 291-92.)  Eid testified that if he had not stopped at the scene, "they would have killed him."  (RT. 296.)  The severity of Harpst's injuries also supported intent to kill.  (RT. 319-24.)

Petitioner has failed to demonstrate that the state court's decision rejecting his insufficiency of the evidence claim in regard to specific intent to kill, was contrary to or an unreasonable application of federal law, or based on an unreasonable determination of the facts of this case.  Accordingly, petitioner is not entitled to habeas corpus relief on this claim.  28 U.S.C. § 2254(d).

C.  Sufficient Evidence That Crimes Were Committed for Benefit of Criminal Street Gang

Petitioner's second claim is that there was insufficient evidence that the crimes were gang related or benefitted the Red Nose Pittz or the Nortenos, because Officer Duggins, the prosecution's gang expert, testified on cross-examination that he was not aware of anyone in the community who had heard of this incident, aside from Vanessa and Erica, which contradicted his

1   earlier testimony that police had talked to a lot of people who had heard about it.[4]   Petitioner also

2   argues that during the crime, he and Romero were not wearing gang colors; they did not announce

3   themselves as gang members by words or signs; they did not mention rival gangs, gang turf, or

4   that the crime was payback for a crime committed against the Red Nose Pittz or Nortenos.

5   Petitioner also points to Duggins' testimony that petitioner, as a Red Nose Pitt, could not do

6   criminal activity on Broderick Boy turf without their permission.

7          In this regard, the California Court of Appeal rejected these arguments, reasoning as

8   follows:

9          Defendant next contends there is insufficient evidence that he
10         committed the charged crimes for the benefit of a criminal street
           gang within the meaning of section 186.22, subdivision (b)(1).

11         "In considering a challenge to the sufficiency of the evidence to
12         support an enhancement, we review the entire record in the light
           most favorable to the judgment to determine whether it contains
13         substantial evidence – that is, evidence that is reasonable, credible,
           and of solid value – from which a reasonable trier of fact could find
14         the defendant guilty beyond a reasonable doubt.   [Citation.]   We
           presume every fact in support of the judgment the trier of fact could
15         have reasonably deduced from the evidence.   [Citation.]   If the
           circumstances reasonably justify the trier of fact's findings, reversal
16         of the judgment is not warranted simply because the circumstances
           might also reasonably be reconciled with a contrary finding.
17         [Citation.]   'A reviewing court neither reweighs evidence nor
           reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar*
18         (2010) 51 Cal.4th 47, 59-60 (Albillar).)

19         Section 186.22, subdivision (b), does not criminalize mere gang
           membership, and not every crime committed by a gang member is
20         gang related.   (*Albillar*, *supra*, 51 Cal.4th at p. 60; *In re Frank S.*
           (2006) 141 Cal.App.4th 1192, 1196.)   The prosecution's proof of
21         defendant's gang membership at the time of the offense does not,
           by itself, support the enhancement; the prosecution must also prove
22         that (1) defendant committed the crime "'for the benefit of, at the
           direction of, or in association with any criminal street gang,'" and
23         (2) defendant committed the crime with the specific intent to assist
           in any criminal conduct by gang members.   (*Albillar*, *supra*, 51
24         Cal.4th at p. 59.)

25         Defendant does not dispute that the second prong of the statute is
           met, because there is substantial evidence that he intended to and
26         did commit the charged felonies with Romero, a known member of
           the Red Nose Pittz gang.   Under the circumstances, the jury could

27   _____

28   [4]  This fact is significant because gang members tend to brag about their crimes to bolster their
     reputation in the gang.

fairly infer that defendant had the specific intent to promote, further, or assist Romero's criminal conduct. (*Albillar*, supra, 51 Cal.4th at p. 68.)

But defendant challenges the evidence in support of the first prong. A crime can satisfy the first prong when it is committed in association with the gang, or when it is committed for the benefit of the gang. (*Albillar*, *supra*, 51 Cal.4th at p. 60.) Evidence that gang members acted in concert can provide substantial evidence the crime was committed in association with the gang (*id.* at pp. 60-63), and expert opinion is admissible as part of the evidentiary showing on how the crimes can benefit the gang (*id.* at pp. 63-64). For example, "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of … a[] criminal street gang' within the meaning of section 186.22(b)(1). (See, e.g., *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [relying on expert opinion that the murder of a nongang member benefited the gang because 'violent crimes … elevate the status of the gang within the gang culture and intimidate neighborhood residents who are … "fearful… that they may be the gang's next victim…"']; *People v. Romero* (2006) 140 Cal.App.4th 15, 19 [relying on expert opinion that 'a shooting of any African-American men would elevate the status of the shooters and their entire [Latino] gang'].)" (*Albillar*, *supra*, 51 Cal.4th at p. 63.)

Defendant argues that no rational trier of fact could find the crimes benefitted the Nortenos and/or the Red Nose Pittz gang. According to defendant, "the primary evidence here was the gang expert's testimony, which was based on purely general principles and speculation, rather than on facts specific to this case." Defendant believes the evidence shows nothing more than that he is a gang member, and that he committed the charged crimes with Romero for their own purposes. This is so, he argues, because the crimes were not committed against a rival gang member, and there is no evidence defendant and Romero yelled gang slogans or threw gang signs. Defendant's argument is not persuasive.

The evidence at trial disclosed that defendant and Romero were both members of the Red Nose Pittz gang, a Norteno subset. Officer Duggins testified that committing crimes elevates a member's status within the gang, as well as the gang's status in the community when the word gets out, and word does get out. He explained that the use of force or fear creates respect with gang members. When law enforcement investigated the crime, many people had heard about the assault on Harpst committed by well-known Nortenos. Defendant even commented that he had heard rumors about the assault, including that the victim was dead or brain dead.

Defendant told Officer Herrera that the Red Nose Pittz assaulted people to show the Broderick Boys that the Red Nose Pittz were worthy of being Nortenos in the Broderick area, and because they were tired of getting beaten up by the Broderick Boys. Ramos told the police the Red Nose Pittz liked to jump people and rob them in

order to gain respect from other Nortenos.  According to Ramos, the gang will beat up anyone who "talks shit to [th]em."  Defendant told Officer Herrera and Detective Estrada that Romero and defendant assaulted Harpst after he disrespected them by throwing a cigarette at them.  Defendant told Detective Estrada that when someone disrespects you in front of your "homeboy," you disrespect them back.

The evidence shows that defendant, in association with Romero, a fellow gang member assaulted Harpst because they felt disrespected by him, and when you are disrespected in front of a fellow gang member you have to respond.  Their response was to assault and rob Harpst, the type of crimes their gang committed to gain the respect of the Broderick Boys.  People in the community had heard about the attack and the serious injuries suffered by Harpst, all of which benefitted the gang's status in the community.  There is substantial evidence the crimes were gang related.

Defendant counters that there was evidence an attack in the Broderick Boys' territory could create problems for the Red Nose Pittz because the assault would increase police presence in the area, which the Broderick Boys would construe as disrespecting their territory.  However, a finding supported by substantial evidence will not be set aside merely because the circumstances might also be reconciled with a contrary finding.  (*Albillar*, *supra*, 51 Cal.4th at p.60.)  Whether the attack on Harpst was gang related or personal was a question for the jury, which was appropriately instructed that there needed to be evidence beyond the gang expert's opinion and the mere fact of defendant's gang membership in order to return a true finding on the gang enhancement.  The jury decided the crimes committed against Harpst were gang related, and substantial evidence supports its determination.

(Res't's Lod. Doc.1 at 10-14.)

In this case, petitioner received an enhanced sentence for criminal street gang activity pursuant to Penal Code § 186.22(b)(1), which imposes penalties for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members...."  People v. Albillar, 51 Cal.4th 47, 56 (2010).

Respondent contends that petitioner's argument is limited to rehashing points already made on direct appeal and rejected by that court.  Addressing petitioner's points one at a time, it is true that Officer Estrada conceded on cross-examination that he did not see any gang signs exhibited at the scene where the victim was on January 21st.  Nor did anyone in any of his interviews report seeing evidence of gang signs at the scene.  (RT. 448-49.)

1      Nevertheless, the evidence as set forth by the court of appeals and in the record constitutes

2 sufficient evidence that the crimes at issue were gang related.

3      The Court of Appeals discussed the evidence which showed that "many people had heard

4 about the assault on Harpst committed by well-known Nortenos.  Defendant even commented that

5 he had heard rumors about the assault, including that the victim was dead or brain dead."  (Res't's

6 Lod. Doc. 1 at 12-13.)  Furthermore, the transcript of record elaborates the evidence in support.

7 Officer Duggins testified: "when we went out and we were looking for Mr. Delgado and Mr.

8 Romero, we were talking to a lot of people, and a lot of people had heard about this crime, and

9 that elevated their status…."  (RT 721.)  Petitioner claims that Officer Duggins admitted on cross-

10 examination that he was not aware of <u>anyone</u> in the community who had heard of this incident

11 from appellant other than Vanessa and Erica.  (ECF No. 1 at 7.) (emphasis in original).  That

12 statement is taken out of context however.  The full colloquy on this subject was as follows:

13      Q (by defendant's attorney):  You testified that out in the community there was quite a bit

14 going around about this particular incident, the January 21st, 2009, incident?

15      A:  Yes, ma'am.

16      Q:  And isn't it fair to say that a lot of that out in the community came from the police

17 officers?

18      A:  I don't know if it's fair to say.  We didn't cause that incident to happen.  We were

19 trying to find Mr. Delgado and Mr. Romero, and in the course of that we contacted a lot of

20 people, and a lot of people we contacted had heard about that prior to us contacting them.

21      Q:  Who had they heard it from?

22      A:  People in their community, other people.

23      Q:  Anything from Mr. Delgado?

24      A:  Well, the night of Vanessa told us in an interview that he came back and was telling

25 her about it.

26      Q: Other than Vanessa Ramos?

27      A:  And Erica Raya.

28      Q:  Other than what we've already heard?

1   A:  Not that I'm [a]ware of, no.

2   Q:  So you're not aware of any kind of bragging, other than what we've heard here, if you

3   can consider that bragging?

4   A:  No, ma'am.

5   (RT. 751-52.)  Taking this questioning in context, it is safe to infer that the officers heard about

6   this crime from "a *lot* of people" and that the number amounts to more than just Ms. Ramos and

7   Ms. Raya, which would be only a *couple* of people.  It might be safe to infer that defendant,

8   Romero, Ramos and/or Raya may have been responsible for word getting out to "a lot of people."

9   Elsewhere, Officer Duggins testified as follows:

10   Q:  Do you have any particular comments that were made to members of the gang that

11   were bragging about the particular incident?

12   A:  Not to the members of the Nortenos, but to members in the community.

13   Q:  Specifically from Mr. Delgado?

14   A:  Yes.

15   Q:  Other than Ms. Ramos and Ms. Raya?

16   A:  Other than them, no.

17   (RT. 771.)  Officer Duggins provided a source for the awareness in the community that this crime

18   had been committed by petitioner, and that was petitioner himself, as well as Ms. Ramos and Ms.

19   Raya.

20   Moreover, Officer Herrera, the officer who interviewed petitioner after he was taken into

21   custody, focused on gang questions, based on his training.  (RT. 508-09.)  He testified about a

22   photo in which petitioner was throwing gang signs, (RT. 513), about petitioner's gang nickname,

23   (RT. 516), and that petitioner admitted he was with the Red Nose Pittz gang.  (RT. 516).

24   Petitioner conceded to this police officer that his gang related activities include beating and

25   robbing people in order to garner respect with the Broderick Boys, the predominant West

26   Sacramento gang.  (RT. 517-18.)  Petitioner told Officer Herrera that he and his fellow gang

27   members would tell people they were committing crimes and spread the word so that the

28   Broderick Boys would hear about it and think they were cool.  (Id. at 518-19.)  Officer Duggins'

1    testimony, along with petitioner's statements to Officer Herrera, support the bragging aspect of

2    benefitting the gang, and also refutes petitioner's contention that no one in the community had

3    heard about the incident, especially since the goal of the beating was to make sure the Broderick

4    Boys heard about it.

5          Petitioner's own account to Officer Herrera was that he started hitting the victim because

6    the victim had disrespected him and that because Michael Romero, another gang member, was

7    with him and would look down on petitioner if he did not do anything to react to the disrespect.

8    (Id. at 525.)  Officer Herrera also testified that he interviewed Ms. Ramos (RT. 547), and she told

9    him that petitioner had been engaged in gang activity for a couple of months around the time of

10    this incident, that he and Romero were doing these crimes to get respect from the Broderick Boys

11    (RT. 550), and that on the night of the incident he told her they were "going to go look for

12    somebody to rob or to roll" and/or beat up.  (RT. 551).  When they returned from the crimes,

13    petitioner told Ms. Ramos that they had "robbed some guy and they punched, kicked, and

14    stomped him and Romero pulled a tooth out of his – one of his knuckles."  (Id. at 551.)  Petitioner

15    admitted to Officer Herrera that the only crimes he admitted to committing were robbing and

16    beating up people, that he did them as part of being a member of a criminal street gang, and had

17    done so a few times.  (Id. at 563-64.)

18          This evidence fully supports the jury's finding that petitioner engaged in the crimes for the

19    benefit of a criminal street gang.  The state courts' denial of habeas relief with respect to

20    petitioner's insufficient evidence claim is not an objectively unreasonable application of Jackson

21    and Winship to the facts of the case.  Accordingly, petitioner is not entitled to federal habeas

22    relief with respect to this claim.

23    III.  Prior Bad Act Evidence

24          Petitioner's last claim is that despite the court's ruling that his prior misdemeanor arrest

25    for assault would be excluded under Cal. Evid. Code §§ 1101(a) and 352, evidence came in

26    through Detective Estrada's testimony which referred to plaintiff's history of assaults, and

27    violated his due process rights.

28    / / /

The California Court of Appeal rejected the argument that prior bad act evidence violated petitioner's due process rights, as set forth in the following portion of the opinion:

> Defendant maintains he was denied due process when evidence of a prior bad act was presented to the jury, despite the trial court's prior ruling excluding the evidence.  He argues the error was prejudicial because it diverted the jury's attention from the reasonable doubts inherent in the prosecution's case by portraying defendant as an antisocial individual of generally bad character.
>
> During the trial, defense counsel moved to prohibit the prosecution from introducing evidence of defendant's prior misdemeanor behavior involving the assault of a "bum," as well as the fact of defendant's probationary status.  Defense counsel sought to exclude specific portions of Ramos's interview.  The trial court ordered that the specified portions be redacted from the recording and transcript of the interview.  The trial court added: "Let me make my position clear. [¶]  I would bar testimony or evidence of the defendant's prior misdemeanor behavior for an assault on some, what we'll call, bum under [Evidence Code section] 1101 [,subdivision] (a) and under [Evidence Code section] 352."
>
> Although the prosecutor redacted most of the statements from Ramos's interview, one specified reference was missed.  Detective Estrada mentioned defendant's arrest for beating up a bum and asked Ramos if she knew of other incidents where defendant assaulted anyone.  Ramos replied that she only knew about "[t]his one and the bum."
>
> Thereafter, before the jury heard the recording of defendant's pretrial interview, defense counsel objected to anything coming in that contravened the trial court's prior ruling.  Defense counsel singled out specific objectionable portions of the transcript of defendant's interview.  The trial court ordered certain redactions.  But the transcript of defendant's interview given to the jury (while it heard the recording of the interview) includes a reference by defendant to the fact he "almost [got] convicted of something like this before" and Detective Estrada's response, "I know you have a history of this …."
>
> Defendant's claim of error is unavailing because it is inconceivable that he suffered any prejudice from the jury hearing the aforementioned portions of Ramos's and defendant's interviews.  From other properly admitted evidence, the jury knew that defendant and his gang, in an effort to establish their worthiness as Nortenos, jumped or beat up people who dared to "talk[] shit to [t]hem."  More importantly, Eid testified he witnessed Harpst brutally beaten by two men, and defendant admitted that he, and fellow gang member Romero, assaulted Harpst over a tossed cigarette and perceived disrespect.  But for Eid's intervention, Harpst might not have survived.  Under the circumstances, it is not reasonably probable that absent the alleged evidentiary errors the jury would have returned different verdicts on any of the charges.  (*People v. Cudijo* (1993) 6 Cal.4th 585, 611.)  In fact, the alleged

errors are harmless beyond a reasonable doubt.   (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

(Res't's Lod. Doc.1 at 14-15.)

Respondent counters that not only were the state court's reasons for denying relief reasonable as set forth, but more importantly there is no clearly established Supreme Court precedent requiring the state court to grant relief because admission of evidence violates due process.

A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law.  Wilson v. Corcoran, 562 U.S. 1, 131 S.Ct. 13, 16 (2010).  Absent some federal constitutional violation, a violation of state law does not provide a basis for habeas relief.  Id.  A petitioner may not "transform a state-law issue into a federal one" merely by asserting a violation of the federal constitution.  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir.1997).  Rather, petitioner must show that the decision of the California Court of Appeals "violated the Constitution, laws, or treaties of the United States."  Little v. Crawford, 449 F.3d 1075, 1083 (9th Cir.2006) (quoting Estelle v. McGuire, 502 U.S. 62, 68 (1991)).  Accordingly, to the extent petitioner's due process claims are based on alleged violations of state law governing the admissibility of evidence, they should be rejected.

A state court's evidentiary ruling, even if erroneous, (or erroneously not followed as in this case), is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir.1991).

Moreover, as the Ninth Circuit has observed:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley, 568 F.3d at 1101.  Therefore, "under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas

1   corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme

2   Court."  Id.  On the basis of these authorities, the state court's rejection of petitioner's due process

3   claim here does not support federal habeas relief under AEDPA because the admission of

4   evidence at trial regarding petitioner's prior assault on Miller did not violate any clearly

5   established federal law.  Id.

6       Similarly, the United States Supreme Court "has never expressly held that it violates due

7   process to admit other crimes evidence for the purpose of showing conduct in conformity

8   therewith, or that it violates due process to admit other crimes evidence for other purposes

9   without an instruction limiting the jury's consideration of the evidence to such purposes."

10  Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir.2001), *overruled on other grounds by*

11  Woodford v. Garceau, 538 U.S. 202, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003).  See also Alberni

12  v. McDaniel, 458 F.3d 860, 863 (9th Cir.2006).  In fact, the Supreme Court has expressly left

13  open this question.  See Estelle v. Mcguire, 502 U.S. at 75 n. 5 ("Because we need not reach the

14  issue, we express no opinion on whether a state law would violate the Due Process Clause if it

15  permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").  See

16  also Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir.2008) (holding that state court had not acted

17  objectively unreasonably in determining that the propensity evidence introduced against the

18  defendant did not violate his right to due process); Alberni, 458 F.3d at 863–67 (denying the

19  petitioner's claim that the introduction of propensity evidence violated his due process rights

20  under the Fourteenth Amendment because "the right [petitioner] asserts has not been clearly

21  established by the Supreme Court, as required by AEDPA"); United States v. LeMay, 260 F.3d

22  1018 (9th Cir.2001) (Fed.R.Evid. 414, permitting admission of evidence of similar crimes in child

23  molestation cases, under which the test for balancing probative value and prejudicial effect

24  remains applicable, does not violate the due process clause).  In short, because the state court's

25  rejection of petitioner's due process claim is not contrary to any United States Supreme Court

26  precedent, petitioner is not entitled to federal habeas relief with respect to this claim.

27       Petitioner's claim would also fail under controlling Ninth Circuit precedent.  That court

28  has held that the admission of "other acts" evidence violates due process only if there were no

1    permissible inferences the factfinder could have drawn from the evidence.  See McKinney v.

2    Rees, 993 F.2d 1378, 1381 (9th Cir.1993) (question is "whether any inferences relevant to a fact

3    of consequence may be drawn from each piece of the evidence, or whether they lead only to

4    impermissible inferences about the defendant's character"); Jammal, 926 F.2d at 920 ("[e]vidence

5    introduced by the prosecution will often raise more than one inference, some permissible, some

6    not; we must rely on the jury to sort them out in light of the court's instructions").  See also

7    LeMay, 260 F.3d at 1027 (evidence of prior similar crimes "will only sometimes violate the

8    constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far

9    outweighs what little relevance it might have").

10        Here, as explained by the state appellate court, portions of the challenged evidence

11   admitted despite the trial judge's ruling excluding it, was harmless beyond a reasonable doubt

12   because the properly admitted evidence established that petitioner and his gang typically "jumped

13   or beat up people who dared to "talk[] shit to [th]em" in order to "establish their worthiness as

14   Nortenos."  The evidence of petitioner's guilt was overwhelming.  As pointed out by the state

15   court of appeals, there was a direct eyewitness, Mr. Eid, who testified he saw Harpst being

16   brutally beaten by two men.  Defendant admitted that he and Romero, a fellow gang member,

17   attacked the victim because they perceived his tossing them a cigarette signified disrespect.

18   Harpst probably would not have lived if Eid did not intervene.  As pointed out by the appellate

19   court, it was not probable that the jury verdict would have been different had the alleged

20   evidentiary errors not been made.  Therefore, in light of the significant and substantial evidence

21   of petitioner's guilt, admission of the challenged evidence did not prejudice the result.

22        Under these circumstances, any error in admitting evidence of petitioner's prior assault did

23   not result in a due process violation.  Nor did it have "a substantial and injurious effect or

24   influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct.

25   1710, 123 L.Ed.2d 353 (1993).  See also Penry v. Johnson, 532 U.S. 782, 793–96, 121 S.Ct.

26   1910, 150 L.Ed.2d 9 (2001).

27        For all of the reasons set forth above, petitioner has failed to demonstrate that the state

28   court's decision rejecting his due process claim was contrary to or an unreasonable application of

1  federal law, or based on an unreasonable determination of the facts of this case.  Accordingly,

2  petitioner is not entitled to habeas corpus relief. 28 U.S.C. § 2254(d).

3  <u>CONCLUSION</u>

4       For all of the foregoing reasons, the petition will be denied.  Pursuant to Rule 11 of the

5  Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

6  appealability when it enters a final order adverse to the applicant.  A certificate of appealability

7  may issue only "if the applicant has made a substantial showing of the denial of a constitutional

8  right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in this order, a substantial showing of

9  the denial of a constitutional right has not been made.

10       Accordingly, IT IS HEREBY ORDERED that:

11    1.  Petitioner's application for a writ of habeas corpus is denied; and

12    2.  This court declines to issue a certificate of appealability.

13  Dated: March 27, 2015

14                 /s/ Gregory G. Hollows

15                UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20  GGH:076/Delg1739.hc

21

22

23

24

25

26

27

28